UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CLINTON MCGRAW, * Docket No. 15-394
*
Plaintiff, *
*
VS * October 27, 2017
*
UNITED TUGS, INC., *
*
Defendant. * Section A

*****************************************************************

**VOLUME V**

**REPORTER'S OFFICIAL TRANSCRIPT OF THE TRIAL PROCEEDINGS BEFORE THE HONORABLE JAY ZAINEY, UNITED STATES DISTRICT JUDGE, AND A JURY**

*****************************************************************

**APPEARANCES:**

For the Plaintiff: Falcon Law Firm
BY: TIMOTHY J. FALCON
JARRETT S. FALCON
JEREMIAH A. SPRAGUE
5044 Lapalco Blvd.
Marrerro, LA 70072

For the Defendant: Frilot, LLC
BY: PATRICK MCSHANE
LARA N. DICRISTINA
1100 Poydras St., Ste. 3700
New Orleans, LA 70163

**REPORTED BY:** Mary Thompson, RMR, FCRR
500 Poydras St., Room B-275
New Orleans, Louisiana 70130
(504)589-7783

**OFFICIAL TRANSCRIPT**

# I N D E X


| | PAGE NO. |
|---|---|
| Closing Argument by the Plaintiff................ | 1084 |
| Closing Argument by the Defendant................ | 1101 |
| Further Closing Argument by the Plaintiff........ | 1122 |
| Jury Charge...................................... | 1130 |
| Jury Questions................................... | 1148 |
| Verdict.......................................... | 1161 |

P R O C E E D I N G S

(Call to order of the court.)

THE COURT: There needs to be a couple issues resolved before the jury comes in?

09:58:03 MR. TIMOTHY FALCON: Yes, Your Honor.

THE COURT: What are they and by whom?

Everybody can have a seat.

Mr. Falcon?

MR. TIMOTHY FALCON: Good morning, Your Honor.

09:58:10 First what we'd like to take up with the Court is we've had a short piece of official transcript transcribed overnight. It's the Monday testimony of Captain Brad Adams, just a couple of pages, and then yesterday's testimony of Captain Adams. And I would like to include it in my closing argument.

09:58:29 THE COURT: An objection?

MR. MCSHANE: Yeah, we do object, Judge. We didn't know that that was an option, and the plaintiffs didn't tell us they were doing that last night. We would have ordered stuff, too, so we object. It's a surprise and not fair.

09:58:39 THE COURT: Well, I'm going to allow it. It's not going to go to the jury. I mean, this is official transcript paperwork. All you're doing is reminding them of what was stated in court, and I think it's proper argument anyway. So I am going to allow that.

09:58:53 MR. TIMOTHY FALCON: Thank you, Your Honor.

THE COURT: It would have been nice had you let defense counsel know, because he might have wanted to do some as well, but it is what it is. I don't find that to be objectionable at all. It is not evidence. It's not going to the jury. It's obviously more accurate than your paraphrasing what somebody might have argued, I got that, so I don't have a problem with that.

I'll note your objection, Mr. McShane.

MR. TIMOTHY FALCON: The second item, Your Honor -- and we tried to resolve this last night under your instructions. We were told that the exhibits to go to the jury, if we could agree on some excerpts that could be taken out of the exhibit books -- and this goes to the logs. There are tons of logs. We wanted to pull out the ones that we referred to during Mr. McGraw's examination, which basically are the logs for the dates he's on all their vessels. We were going to pull those out and send those to the jury.

Mr. McShane wanted some other logs, which we don't have a problem going in, so that's basically what we tried to agree to. Our understanding was if you couldn't agree to what was pulled out, they all just go to the jury. We're fine with that. We don't think we have agreement. That was a controversy this morning.

THE COURT: Yes, ma'am, Ms. DiCristina. Why don't you come to the microphone.

MS. DICRISTINA: Sure.

Your Honor, we oppose putting all the logs in. They did give us select dates, but they are five-page documents and they're wanting to put, on some pages, Page 1 and Page 4 and on others, Pages 3 and 5. At this late hour, we really think it would be just easiest to just go ahead and put the entirety of the exhibit in. Shaveka Joshua kindly worked last night and again this morning to assemble all of the exhibits that go to the jury, and that would be, I think, the easiest thing to do to be able to go ahead and proceed with closing arguments.

10:00:15
10:00:32

THE COURT: Okay. That's fine.

Again, that was -- y'all had agreed to the whole thing being admitted into evidence anyway. It's just, as I said, it would have been preferable to have just whatever was referred to, but if you can't agree, it all goes to the jury. It's very simple.

10:00:44

Anything else?

(No response.)

THE COURT: All right. Thank you very much.

10:00:48 How much time, Mr. Falcon, did you want upfront?

MR. TIMOTHY FALCON: I'm going to try to do 15 and then save the rest.

THE COURT: Well, James will let you know when it's 15 minutes and then you decide what you want to do.

10:01:01 All right. Thank you.

Call in the jury.

I believe you have in front of you the final draft.

MR. MCSHANE: Yes, Your Honor, we do.

(Jury in at 10:02 a.m.)

10:02:01 THE COURT: I hope you had a restful evening. Please have a seat.

Okay. We're going to begin now closing arguments. As I stated to you yesterday, each party is given 30 minutes. Plaintiff goes first, and plaintiff can go last because they have 10:02:19 the burden of proof, but they have a total of 30 minutes. And defense counsel is entitled to a total of 30 minutes as well.

Mr. Falcon, go ahead and proceed, please.

MR. TIMOTHY FALCON: Thank you, Your Honor.

Good morning.

10:02:30 Shortly, when you go to the jury deliberation room, you have three jobs to do. The first one is to answer the questions the judge gives you. The second one is when you give the answers, you need to explain why you're giving the answers. And thirdly, you need to render a verdict that protects our 10:02:48 community.

And why do I say you need to render a verdict that protects our community? Think about it in the criminal context. If somebody's falsely accused of something in a criminal case, he's going to go to trial and get a jury to say I was falsely 10:03:00 accused. If somebody was not falsely accused, the prosecutor is

going to take them to trial and try to prove there was guilt.

So the jury is there to see which one is telling the truth. The jury is there to make sure that people don't get falsely accused in our community. The jury is also there to make sure that criminals don't get away with criminal acts to protect our community.

It's the same thing in civil cases. And it's similar in this situation where, if somebody comes in the courtroom who is a plaintiff who has not been injured, it's not by somebody's fault, they have lied about something and they're trying to get money they don't deserve, then the jury can protect our community from that.

On the other hand, if a defendant comes in here and they have safety rules they are supposed to follow, safety rules that are designed to protect us, and they ignore those safety rules, they ignore regulations that require them to follow certain Coast Guard documents, they ignore the training requirements to make sure their crews are properly trained, they ignore the safety rule that says you're supposed to put proper lines on your vessels -- when those types of defendants come in here and violate those safety rules, the jury's obligation is to render a verdict that protects our community from those type of actions.

You know, I've tried cases in Orleans Parish and Jefferson Parish, and when you come to federal court, the unique

10:04:33
10:05:05
10:05:21
10:05:41
10:05:59

thing is we have jurors from St. James, St. Tammany, Terrebone, and Orleans so we have kind of all of South Louisiana, and that's our community.

And one thing that's important in South Louisiana is the maritime industry. We are all on boats. Everybody knows somebody that's working on boats or somebody that's working around the river. We're riding ferries.

I have a painting in my office. This painting I look at every day, and to me it reflects -- this is a painting that was done by a lady in Marrero, and this is of the Mississippi River bend looking down from one of the hotels. And this kind of reflects what's going on in our community. We've got marine traffic. We've got tourism traffic. We've got ferries. We've got tugboats. We've got harbor boats. And when I look at that picture, I understand my job, when I have a case and I'm the civil prosecutor, is to look at how do we make sure safety rules are applied in these type of situations.

So in this particular case we talked about a couple of safety rules, and one of the safety rules was when you use a headline, make sure you tie it off properly.

Now, there's been some controversy whether or not this headline rule actually applies to this case. But we have the testimony from Mr. Eymard himself, the owner of the company, and we talked to him about it.

We went through the whole process and I asked him in

10:06:09 10:06:14 10:06:24 10:06:34 10:06:48

his deposition (as read): I just told you no safety rule --

MR. MCSHANE: Your Honor, objection. This is a deposition transcript.

THE COURT: It has to be trial.

MR. TIMOTHY FALCON: This was brought up in court, Your Honor.

THE COURT: I can't hear you.

MR. TIMOTHY FALCON: This testimony was brought up in court.

THE COURT: Okay, ladies and gentlemen, you listened to the testimony in court, and --

You are not going to read from a deposition, though. You are only -- you can --

MR. MCSHANE: It's on the screen, Judge, and it has not been offered as evidence.

THE COURT: Okay. That goes off the screen. That goes off the screen.

Ladies and gentlemen, this is closing argument and this is the evidence that's argued as each side sees it, but at the end of the day you're the ones who listened to what was testified to. They're just trying to sum up from their prospective.

Okay. Go ahead and proceed, Mr. Falcon.

MR. TIMOTHY FALCON: What we heard from Mr. Eymard at trial was -- first he came in trial and said, No, this headline rule doesn't apply to offshore operations, it just applies to

inshore operations. And so we were trying to find a way and so I had to -- because I had taken his deposition, and I said, Mr. Eymard, let's go back and refresh your memory. You said it applies to both, in all operations, so why didn't they apply in this case?

10:07:05

And let's look at the rule itself.

This is from their manual.

(As read): Wheelman on watch is responsible for deciding when and how to use the headlines, and when he does that, the deckhands do what he's told. Four-part headlines may be needed in rough weather in emergencies.

10:07:24

It's a simple rule. There was a big question about do we need an expert to talk about that. No, we don't. If you tie off your vessels with four headlines, it's much less likely they're going to break away.

10:07:37

And they went on to say, Well, this might be for barges because there's some language there.

And I said, Well, if it's just for barges -- and this seems like pretty fundamental stuff of what you're supposed to do. If it's just for barges, here's your 250-page safety manual. Where's the section for offshore boats when you have rough seas and you have workers who maybe have never done this operation before, like Mr. McGraw? Where's it in your manual how to do that?

10:07:51

They said it's not there.

10:08:06

10:08:22 10:08:38 10:08:55 10:09:13 10:09:27

They also said there's no training for this. Everybody from the defense said no training on how to do this.

So when you go back and deliberate, and someone in the jury room says, I just don't think that headline rule applies to this case, I don't think they had to use that rule, you need to remind them that Mr. Eymard said it applies, the safety rule is very logical, common sense, and if they would have applied it, more likely than not -- which is the standard, more right than wrong -- this accident wouldn't have happened.

The other safety rule that we talked about in court was if you can't tie off properly, find another way to secure your vessel. You know, we talked about the cruise ship. If a storm was coming into Miami, what do they do with that cruise ship? I think the Disney cruises take it out to sea. If you can't ride out a storm safely because you can't tie it off, find another way to secure it.

And there was a way to secure it in this case, run the weather pattern. In fact, there was a little bit of controversy between are we 35 miles offshore, which is this point that Ms. Cantu said, or was it only 11 miles. If they were only 11 miles offshore, how long would it take them to get to shore and get inland and avoid the storm altogether?

If you're not going to do that, why don't we apply the safety rule of when to run a weather pattern?

This crew was paid for 24 hours to prepare for a storm.

This crew had four crewmembers to go find a proper place to tie off, not one with some defective mooring spot, not some that a rig is going to be pulled over if the winds are too bad, not one where their boat would be damaged if the line doesn't pop. They had 24 hours to do that. And what did they do? Nothing except for the same thing they kept doing.

10:09:52

You know, it's the same thing they kept doing two weeks before on June 13th, Captain Adams at the wheel. The seas rose up 7 to 8, 10 feet. Right here (indicating), parted hang-off line. Running weather pattern.

10:10:19

It happened once, okay, we're not going to do it again. That's two weeks before.

Now, when those storms come in, it's two weeks before. A new crew comes out, we have a crew change. Safety rule -- Ms. Cantu talked to you about it -- is have a safety meeting. Talk about what could happen.

10:10:31

Was there a safety meeting? No. Did anybody go over that? No. A violation of the safety rule. We have to enforce safety rules, ladies and gentlemen.

So then we go to what actually happened, and we get to the day of the accident. Hanging off headlines. Hanging off headlines.

10:10:42

Now, you know, a part of protecting the community is making sure people don't come to court and lie, and I'm really sorry to do this but what we have proven in this case is we took

10:11:11

10:11:27
10:11:48
10:11:57
10:12:11
10:12:28

the testimony of Mr. Adams, Captain Adams, on the first day of trial. It's a little unusual for the plaintiff to call all of the defense witnesses in the plaintiff's case. We did it in this case because we knew it was necessary. We also called their defense doctor in our case because it was necessary.

But we have a transcript from the first day of trial. We have the testimony from Captain Adams.

(As read): So according to this log, you did not get back onboard the vessel until 1800, correct?

I was always onboard the vessel.

I'm sorry. Let me rephrase. You are correct. That was a bad question. According to this log --

THE COURT: You might want to be a little bit lower.

MR. TIMOTHY FALCON: Thank you, Your Honor.

(As read): According to this log, you did not take over watch -- you didn't come back on watch until 1800, correct?

That's correct.

In fact, you had slept until 1730, which is 5:30 in the afternoon, correct?

That's correct.

And when did you take over the vessel -- and when you did take over the vessel, it was already riding weather patterns, it was already out to sea, no lines were tied off. You weren't doing anything with the lines, correct -- you weren't doing anything with the lines?

10:12:53 10:13:16 10:13:35 10:13:56 10:14:11

Correct.

So let's go to yesterday.

We'll go to Line 23.

(As read): Were you up at 1600 or were you sleeping?

I was up.

We had to go through a lengthy process until finally we got the answer again.

(As read): Your answer, I was sleeping?

Correct.

So if anybody in the jury tries to say that the way this accident happened, which is fairly simple -- it didn't happen the way it happened -- if it didn't happen the way Mr. McGraw explained it the whole time, from the very beginning, that there's some other convoluted and crazy other thing that happened, you can simply start off with, who is telling the truth?

Mr. McGraw, from the very beginning, the day of the accident, had one opportunity to do a statement and sign it, and he said, While pulling on the bow line -- I was working on the bow of the boat pulling the headline in off of a platform.

The day of the accident.

He sees Dr. Davis. "I was pulling in a headline off the bow of the boat. I hurt my back."

He never said, I got hurt falling down. He never said, I got hurt when I got knocked out. He never said anything else,

when I hit my chest. That's not his claim. If he had been knocked out and he had a brain injury, this case would be in front of you, but it's not. We did check it. We looked. Everybody looked at that.

10:14:27 The simple fact was this man, at that time -- just like the first incident, he got a sore back. "I'm hurt." This one was worse and he knew it. All he wanted to do was get fixed and go back to the boat, and that was it.

So how did this accident happen? Simply because while 10:14:42 he was pulling in the headline that was still attached to the platform -- and that's the mechanism of the injury. It's important when it's still attached to the platform.

They demonstrated very well to you if it's not attached, we can pull it up. It's probably going to be less 10:15:00 problems. It still shouldn't be out there. You still shouldn't risk them because they want to sacrifice their lines and not their boat. Actually what they're sacrificing is the crewmembers, but that's fine.

So when it's not attached, you can pull it up easy. 10:15:12 You're on the boat and that's fine. But when you've got to get it off the platform, it's a whole other story.

And Captain Campana said it himself. You've got to get up on the bow. You've got to get out there and maybe you have to get up on the platform in rough seas. That was the dangerous, 10:15:25 dangerous situation. And that was the situation that Clinton was

10:15:38 10:15:54 10:16:07 10:16:21 10:16:35

doing at the time he was hurt.

What was the mechanism? It's so tough because it's still attached to the platform. He's up and down in the seas. He's trying to pull it in. The tires are flapping because they are not attached.

The only person that said those tires were attached was who? Captain Campana. Did he show us photographs to show that they were attached? No. Did one of these crewmembers come into this court and say those tires were attached at the bottom? No.

So we have tires flapping. We have a line coming. It gets underneath.

Now, God bless Freddy Creppel. He came in here. And this guy is going through a lot himself. He's got some issues. But he did come in and try to tell the truth, and he explained how difficult this maneuver is. You have a rope, you have to try to swing it. You have to get it around. It gets under the tire. It comes back out.

Guess what? If it comes back out and the boat comes up, it's attached to the platform -- POW. It snatches. Let go -- just let go and you're going to be okay. That doesn't happen. POW, snatch, pain in the back. The man is hurt.

That's the mechanism of injury. That's what happened in this case. And now Mr. McGraw is going to suffer the rest of his life.

So how much time, James?

10:16:58 10:17:13 10:17:29 10:17:43 10:18:01

THE CASE MANAGER: You're at 13 minutes.

MR. TIMOTHY FALCON: Thank you.

So you're going to have some jury instructions.

Your Honor, may I show just parts of the jury instructions to the jury to help explain it to them?

THE COURT: Yes.

MR. TIMOTHY FALCON: So in order to render a verdict that will protect our community, we're going to deal in this case -- and the judge will instruct you -- with a law called the Jones Act. The Jones Act is remedial legislation to protect people who work on ships and vessels.

Why do we need remedial legislation for people to work on ships and vessels? Because it's dangerous out there. It's hard work. If you go to sea, you might be gone for three months. Clinton would leave his family for 28 days and come back home. Not everybody in the world will do that. That's why sometimes you need some of these salty characters we talked about.

But the Jones Act is to protect these people. And when you get hurt on the vessel, in a Jones Act claim, the word "negligence" is liberally interpreted. It includes any breach of duty that an employer owes to its employees who are seamen including a duty of providing for safety of the crew. Under the Jones Act, if the employer's negligent act was the cause in whole or in part --

Now, this is where help and remediation comes in. You

10:18:18 can have a sore back. You can have a sore back for years. A lot of us do. A lot of us have sore backs. We get up and go to work anyway. We don't stop working, you know. Some of us have old football injuries and some of us have other injuries. We still work. You can have a sore back.

If the new accident aggravates it or contributes to it in whole or in part, if it's the slightest cause -- this is so remedial, it just has to be the slightest cause of a new injury -- then you can render a verdict that will protect our community.

10:18:34 In other words, under the Jones Act, the defendant bears responsibility for any negligence that played a part, however slight, in causing the plaintiff's injury.

Now, was there Jones Act negligence? Well, I like the

10:18:52 phrase -- it's a quote. "Insanity is repeating the same mistakes and expecting different results."

Captain Lepine, if it popped the first time, do you retie it?

Yes.

10:19:08 What it if it popped the second time?

Yes.

Do you send the man back out into unsafe conditions, the weather, the second time?

Yes.

10:19:15 Third time?

Yes.

When do you stop?

When we have no more line to tie off with.

Which brings me back to a point. We heard about groceries being delivered, and asked each one of those crewmembers, What else was delivered between the 13th when that line popped and when Clinton was injured? Nobody said a new rope. Ropes had popped before. They pop all the time. Did they send a new rope out? I didn't hear any evidence of it.

10:19:27

10:19:46

Insanity, when you're repeating mistakes and people get hurt, that's Jones Act negligence. It's the classic definition.

The next definition -- the next issue you'll have is was the vessel unseaworthy. A seaworthy vessel is one that is reasonably fit for its intended use. A duty to provide a seaworthy vessel is absolute because the owner may not delegate that duty to anyone.

10:20:08

The vessel owner is required to provide only gear that is reasonably proper and suitable for its intended use.

The intended use of a headline is to keep the boat tied up. It's simple. You don't need an expert to say that.

10:20:30

So why would we have a line that's intentionally there to break? To protect the platform from falling over? To protect the boat from being damaged? It's unseaworthiness; classic example.

10:20:45

Crews that aren't trained to do their job. Captains

that will repeat their mistakes over and over and expect some different result is an unseaworthy captain. Captains who don't do safety meetings between a serious incident to the next one is an unseaworthy crew, ill-trained.

10:21:05 When that happens, Mr. McGraw gets hurt. And remember, this is an emergency situation. They tried to downplay it when they called them back yesterday.

Repeatedly, repeatedly on Monday, Is it an emergency?

Yes.

10:21:21 Why?

It will get in our wheels.

Two of them said it will break the shaft and our vessel will sink and people drown.

What about that line you leave out there by the rig? 10:21:29 It will get in another boat's shaft, too, and cause it to break, sink, and people will drown.

The crew was not trained to handle this emergency situation. That's unseaworthiness.

At this point I'm going to turn the podium over to 10:21:48 Mr. McShane, and I will come back and talk to you about how you render a just verdict for Mr. McGraw that will help compensate him for his harms and losses.

Thank you.

THE COURT: Thank you.

10:22:00 MR. MCSHANE: Before I begin. May we approach? I have

a question for Your Honor.

THE COURT: All right.

**SIDEBAR ON THE RECORD**

MR. MCSHANE: Just as a point of clarification -- I don't want to end up objecting during the second round by Mr. Falcon -- I understand the second round is for rebuttal testimony, only things that I talk about. We haven't heard anything about damages and medical, and if that's going to happen -- I mean, the second round is for rebuttal only, so I just want to make sure that I understand. I would like to get some instruction from the Court, because that's my understanding about how it works, but I don't want to be objecting in the middle of his --

THE COURT: Well, I appreciate that, but that's not my understanding. That's not my understanding of what the law is. I mean, I'll look it up real quick, but that's not my understanding, that his second bite at the apple has to be limited to your close. I've never heard of that before.

MR. TIMOTHY FALCON: Let me just make sure. If there is some rule, I'll go back and do it now.

MR. MCSHANE: That's why I'm raising it now, in fairness to you.

THE COURT: I'll do some quick research. Let me -- I don't think -- I've never heard that before.

MR. MCSHANE: It's rebuttal. That's what it is. So

anyway, that's our position. We won't object to anything beyond that.

THE COURT: Hold on a second. Off the record.

(Discussion off the record.)

10:24:04 THE COURT: I am not -- we're back on the record.

I am not going to limit plaintiff's counsel to what was brought out by defense counsel during his closing argument. I do not consider that rebuttal argument by the plaintiff's counsel, I just believe it's argument. I do not believe that any of the

10:24:59 federal rules would require plaintiff counsel to be limited in his final argument to what is brought out by defense counsel in his closing.

I'll note your objection.

MR. MCSHANE: May I make the objection continuing so I

10:25:17 don't have to interrupt plaintiff's counsel?

THE COURT: I don't want you to interrupt.

And, again, I'm going to say on the record I do appreciate the fact, Mr. McShane, that you did bring it to our attention now so as not to blind-side plaintiff counsel, and I do

10:25:29 appreciate that.

MR. MCSHANE: Okay.

MR. TIMOTHY FALCON: I appreciate it as it well.

THE COURT: But that's going to be my ruling.

MR. MCSHANE: Thank you. Sorry for disrupting the

10:25:36 cadence here.

THE COURT: No, appreciate it.

**AFTER THE SIDEBAR IN OPEN COURT**

THE COURT: Let's proceed, please.

MR. MCSHANE: Ladies and gentlemen, thank you again for your patience and your commitment to your civil service.

10:25:56

I told you at the beginning of this case that this was a credibility case that was going to turn on what witnesses you believed. And I also told you that I had two answers to the plaintiff's claim.

10:26:08

The first answer that I have is that this plaintiff injured himself sitting on a bucket in March, and we're going to be able to prove to you by a preponderance of the evidence that that happened.

The second answer is that when you focus on the line-handling incident of June 27, the plaintiff has the evidentiary burden of proof, which the Judge will tell you when he charges you. He has the evidentiary burden of proof to show that that happened as a consequence of negligence or unseaworthiness by the vessel owner, United Tugs.

10:26:21

10:26:36

So let's talk first about the bucket incident. And, again, when I say credibility case, it comes in immediately in the context of the bucket incident.

Randy Lepine, you heard him yesterday, the guy with the nice sweater. And Randy had testified to three different conversation points that he had with the plaintiff after the

10:26:53

March incident. He said they worked together in mid-June on the EMILE T, and that at that time the plaintiff said to him, I have never gotten better and I'm still having back pain from the bucket incident. And the plaintiff under oath has said he did not have that conversation.

10:27:09

On the grocery day, I have never gotten better from the bucket incident. This is only three days before the line-handling incident. And the plaintiff says, I deny under oath that I had that conversation.

10:27:20

The third conversation is right after the line-handling accident where the plaintiff says, I have never gotten better and my back hurts in the exact same place and in the exact same way that it has hurt all along.

Three conversations that Randy Lepine says happened that the plaintiff said did not happen. These are contested facts, as it's the job of the jury to figure out who's lying about them.

10:27:35

And what I would say to you about it -- I'm not going to put the 2692 form up again. You guys have seen it and I don't have the time to go through it with precision. But ask yourself this: Why would Randy Lepine write that down on the 29th of June? He documented all three conversations. Why would he do that?

10:27:47

And, secondly, why would Randy Lepine tell a lie about that?

10:28:00

10:28:13
10:28:31
10:28:45
10:29:07
10:29:17

We claim that we have proven -- you have to resolve this credibility question. Who's lying? The evidence preponderates in favor of Randy Lepine. And if you find that he is telling the truth about this, then you know that the plaintiff has been saying all through June, I am still hurt, and he is lying about it.

And the reason he's lying about it is because there is no money in a case involving sitting on a bucket. Okay? So he's trying to tie it to some provocative offshore accident.

But answer the question as a group, who's lying about these three conversations? And then have a discussion about what is the significance of that. And if it's Mr. McGraw who's lying, why would he lie? Because there's no money in a bucket incident.

So what did the plaintiff do to try to fix this problem?

These are depositions that we took in the case, a stack of them (indicating). And they're the ones that are condensed, so each of these pages has four pages of deposition testimony. If you wanted to see the real stack, it would be four times this high.

This is when the lawyers get together with the witnesses, and in the search for truth, with a court reporter, together they explore the evidence with the witnesses. And that is done with the plaintiff's lawyers and our lawyers on a stack of deposition transcripts four times this high.

10:29:33 10:29:47 10:30:02 10:30:17 10:30:32

What did the plaintiff do to try to say it's the second accident, not the first? He went -- the plaintiff's lawyer went by himself -- stealthy -- to go visit with Dr. Davis and try to get him to sign an affidavit to say, Oh, it's the second accident. And Dr. Davis took the affidavit that said it's the second accident, scratched out that it is the second accident, and said, That's plausible. Okay?

That wasn't good enough. So what happened? The plaintiff's lawyer went back to his office, gathered some more information. I don't know what he brought with him; I wasn't invited to the party. And by the time he was done visiting with Dr. Davis the second time, Dr. Davis came in and said, on the witness stand, I think it was the second accident.

And we asked him why. And he said two things. He said, one, because that's more rigorous, pulling on a line. That's harder than sitting on a bucket running a deck sander.

And he said, the other thing is there was an added symptom documented the second time, paresthesia, which is numbness or tingling in his leg.

Dr. Todd -- remember him? He's the guy with his hair combed back. Handsome dude. He said paresthesia is a subjective complaint. It's not complaint where the doctor goes and puts his hand on somebody and says, Oh, I feel numbness. It's just an interview. It's part of the history given by the plaintiff. Okay?

10:30:44 10:30:58 10:31:22 10:31:36 10:31:54

So the medical causation opinions in this case that have been given by the doctors -- even Dr. Voorhies says this. He says, Look, I decide to do surgery based on what I see on the diagnostics and my physical examination. But when it comes to causation, it's -- this is actually a quote from Dr. Todd but they all say the same thing -- We depend on what the plaintiff says.

So the causation -- medical causation opinion in this case is only as good and only as reliable and only as trustworthy as Mr. McGraw is, and he is not a trustworthy person. This is the effort, again, to try to tie this accident to the second -- to try to tie the injuries to the second accident.

Dr. Davis. It was suggested that -- in asking these witnesses questions, Mr. Falcon would say -- first of all, let me talk about the rigors of these two jobs.

This is when we know. Every witness who was on the vessel said that what was happening that day was the plaintiff was pulling in a mooring line which is ordinary, usual, customary work of the deckhand. Okay? Nothing unusual about it.

Randy Lepine said, I watched the whole time and he was doing what we have all done so many times that we can't count. So not particularly rigorous. This is a floating line. You heard that the weight was a light-weight line from our expert, Captain Campana. So not particularly rigorous.

And also let's look at what happened on the day of the

bucket incident. The plaintiff was sitting on a 5-gallon bucket squatting down using a 40-pound tool in an awkward position. And he said when he got three or four inches above the bucket, he felt a pop in his back.

10:32:09 And when he felt the pop in his back, you know what he did? He immediately asked for medical care and was given medical care within two hours. They got him to the doctor. He missed four or five days of work. So to act like it's nothing, that's not accurate. Okay? It's not accurate.

10:32:24 And if you compound that, if you find that Randy Lepine is the truthful person -- why would Randy lie -- and that McGraw is lying about his persistent complaints of pain, we know that the bucket incident is what caused this.

Okay. So I told you at the opening of this case that I 10:32:40 thought that the two medical records from Dr. Davis were virtually identical. And I wasn't sure what I said, but because the judge gives us only a little bit of time on opening, for once I actually typed out what I was going to say. I went back and looked and I said "virtually identical."

10:32:55 Mr. Falcon asked a bunch of doctors, If somebody in this courthouse said these records were identical, that would be false?

That's not what I said, folks. And Dr. Todd said they're substantially similar. And you saw them. You heard 10:33:07 Ms. DiCristina with the witnesses compare them and you see how

10:33:26
10:33:45
10:34:00
10:34:19
10:34:31

close they are in terms of diagnosis, complaints of pain, prognosis, treatment modality. They're virtually identical.

But if somebody in this courtroom wants to cast me as telling you guys falsehoods, what I would say is, Well, I guess I'm just going to be lumped in with every other witness, because the plaintiff's theme in this case, in order to try to get you to give him money, is everybody is a liar but me -- everybody.

So let's go through it.

Mr. McGraw versus Randy Lepine. The mid-June conversation, there's a contest there. Somebody is lying.

The grocery conversation, somebody is lying.

The post-accident conversation, somebody is lying.

So we know there's a direct discrepancy there, but there's more.

Mr. McGraw said, Oh, Randy told me, hurry up and get that line. And Randy said, that's not true; that didn't happen.

Mr. McGraw said, Before I went out and got the line the second time, I said please wake up Freddy and get him to help me, and that Mr. Lepine from the wheelhouse said, no, I'm not going to do that.

You heard every member of the crew say that he's not that kind of guy. And you heard Mitch say he's not that kind of guy, he would never do that. These are four guys who have to be able to work closely together for safety purposes.

You heard the mechanism of injury. This is one kind of

global contradictory point where Mr. Lepine says, I'm looking out the window and the guy pulls in the line like I've seen people do hundreds of time uneventfully. It's just pulling in a line. That's what seamen and deckhands do.

10:34:51 And I heard Mr. Falcon say, Well, there's no claim of unconsciousness here. Folks, you were here when Mr. McGraw was on the stand. He did tell somebody that he had been knocked unconscious. And up on the stand he tried to do that I'm-half-pregnant thing, because he tried to back off and say, 10:35:05 Well, I kind of lost consciousness.

But he said he was struck by a wave and his expert said he was struck by a wave. And Randy Lepine said there were no waves coming over the bow.

And he said, The line got stuck in the wheel -- I beg 10:35:20 your pardon, in the tire. And Randy said, That's not true.

He said he was hurled into the gunnel. That's not true, Randy said.

He said he was knocked to the deck twice. That's not true, Randy said.

10:35:30 So Randy's a liar. You've got to believe me and not Randy, and that's how I'm going to get my money.

There's more.

When I was out on the deck, I used the radio to call Randy to say, Hey, man, the line is caught under the wheel -- 10:35:43 under the tire. Randy, That's not true. That didn't happen.

10:36:00 10:36:20 10:36:37 10:36:54 10:37:12

The plaintiff said, After I pulled in that second line, boy, I was beat. I went straight to the shower. Randy said, That's not true. I went out to get the third line and the guy was still sitting on the steps next to me.

And then Randy says, Captain Brad came out on the third line and helped us out, because that's what these guys do. And I offered to go get the third line to help out McGraw because he had gotten the first two and so I did it this time.

McGraw said that didn't happen but Randy said it did. Okay? So Randy's a liar and McShane is a liar and Captain Brad Adams is a liar, too.

Remember when Captain Brad Adams said that he was -- got castigated by the customer 50 miles offshore because Mr. McGraw turned up in a wife beater, basketball shorts, and flip flops, and that he had to report it to the office. They had a customer-relation issue with an important client at a time when the business is going in the tank, and they've got to deal with this because this guy is not prepared to come on his watch and take his job. And the captain said, I gave McGraw what-for, for it. I gave him a dose for it. And McGraw said, That's not true. That never happened. Captain Adams is a liar.

Captain Adams told you that McGraw reported that he had back pain right when Adams came on watch at 6:00 at night. McGraw said, No, no, no, that's a lie. I didn't report back pain to anybody until the next day.

10:37:28 10:37:41 10:37:58 10:38:12 10:38:25

Captain Adams said, I don't care what kind of games y'all want to play with these logs. I have a specific and direct and concrete memory that I came out -- I was in my bed, I heard the engines engaged, that told me that we were no longer hanging off, and I came out in the afternoon. And Lepine said, I'll go get the line, Captain, can you jump on the wheel for me? And the captain did it.

And I said, Why would you do that? It's not your turn yet, you're not on watch. He said, Because we're a team. We help each other. We watch out for one another. Okay?

So I asked Mr. McGraw, did that happen? He said, No. Captain Adams, he's lying, too, just like Randy.

Captain Adams also says that when the third line was retrieved, McGraw wasn't in the shower, he was still out on deck. Okay?

What about Freddy, Freddy Creppel? Liar. Liar. He's a liar, too, because Freddy Creppel admitted on the witness stand -- when the plaintiff said, My back hurts, Freddy said -- because everybody knew about the bucket -- he said, Maybe your back is still tender from the bucket incident. That was his testimony.

What does McGraw say about that? That conversation didn't happen; Freddy's a liar. Add him to the trash heap of liars with McShane, Randy, and Brad.

Remember what else Freddy said about the accident?

10:38:40 10:38:54 10:39:16 10:39:30 10:39:46

When the plaintiff was telling Freddy about the accident, before it was a lawsuit and he was saying he lost consciousness and he was hurled against the gunnel, what he told Freddy on the boat was he was holding a line and it pulled him forward and pulled him down, and that's how he got hurt.

And Freddy said, I thought the guy's explanation was bull. Remember that? B-u-l-l. That's what he said. A 40-year deckhand who understands line-handling, when the guy told him what happened, Freddy was, like, that's nonsense, that did not happen. So Freddy's a liar.

What about Mitch? This guy, Mitch, gave this guy his best chance in life. He never made anywhere near the money he was making with United Tugs, and now the plaintiff wants to have a conspiracy theory trial on why some form wasn't filed with the government a week after this accident.

This case is about whether the plaintiff is owed money damages because of what happened to him in March and/or on June 27th, and when you -- whenever you have a trial where the plaintiff wants to have a -- wants to talk about something other than the accident -- whether the accident report was filed a week later or who was at the wheel when the third line was retrieved -- that's what these guys are doing. This is misdirection. Who cares who's at the wheel when the third line is retrieved? The plaintiff said he was hurt handling the second line.

By the way, the plaintiff said, Oh, I pulled in a line that was broken in half. That's not true. Everybody else says that's not true. They said the plaintiff pulled in a line that broke at the splice all the way at the rig the first time and the second time.

10:39:58

So Randy Lepine is lying about that and Captain Adams is lying about that. And Mitch, he's a liar, too, because if -- he says this: When I lied on my criminal application -- I beg your pardon, on my employment application, I said I'd never had any criminal trouble, and they're trying to say, Oh, Mitch is not being honest if he says that matters to you.

10:40:13

The defense yesterday in cross-examination of Mitch -- the defensive position from the plaintiff, it seemed to be, look, if he got -- if you got duped and you hired the guy, you're not going to do anymore investigation so he never would have been found out so these lies don't really matter. Everything would have been fine.

10:40:29

I'm just going to say that's cynical. Okay? Mitch said, I have to have honest people on my vessels. These guys work in close quarters, four people on one vessel. They have to have integrity. They have to be honest. They have to not be people who go through life trying to game everybody. Okay?

10:40:41

And so Mitch said, Look, I give people second chances. If he had told me about these problems with the law, I might have hired him anyway. If he lied and he came to me later with

10:41:00

10:41:17
10:41:34
10:41:46
10:41:59
10:42:15

contrition and said, Dude, man, I got one over on you but I want to come clean, Mitch -- you heard him, I'd still think about hiring the guy. But here I'm finding out from outside sources and I'm looking at this frank lie that the plaintiff admitted he told for money -- for money. So he could get a job. Just like when he's lying up here. When I found that out, I realized I had a guy I couldn't trust and I would not want him to be part of my crew.

How many minutes have I used?

THE CASE MANAGER: Fifteen and a half.

MR. MCSHANE: That's the credibility contest between the witnesses and the plaintiff.

But, you know, I always thought coming into this case that this jury was going to want to first focus on this guy McGraw, and that the case could well turn on what sort of fellow he is. And let me tell you what we proved in the evidence in this case.

Mr. McGraw, before he came to work for our company, had 13 jobs in 10 years. We went through the Social Security records. Remember seeing that? And he made a couple thousand bucks a year most years. And we know, because he told us, that's because he was doing seasonal shrimping. You don't see any evidence that he was reporting that income to the government on the Social Security records so I don't know how much he made. I can't know because he didn't disclose it to anybody. But he

didn't make much money.

He finally gets a good job in a place where he earned ten grand in one year, and he gets fired because he can't get to work on time.

10:42:27 And then he gets the best job of his life working on a derrick barge for a big company called Manson Construction. That is a great job, and the guy was making good money. He's made $22,000 in his first year. And you know what happens? He gets fired because he fails to attend mandatory safety meetings. 10:42:46 Okay? Mandatory safety meetings.

And this is where the concept of impeachment comes in. When you have a witness on the stand and they get directly impeached, that's something that goes directly to their credibility. When you're looking at who's telling the truth, 10:42:58 remember this: Mr. McGraw, isn't it true you got fired from Manson because you failed to show up for mandatory safety meetings?

That's not true, he says.

I go up to the Judge, I ask for permission to use the 10:43:10 termination slip to impeach the witness.

But before you impeach him, you give him a chance to refresh his recollection. If you're going to call somebody a liar, you better be able to make book on it, right?

So the first thing is, show him the termination slip 10:43:22 and ask him, does that refresh his recollection? Do you remember

now that this is why you got fired? And he said no.

So at that point I offered, filed, and introduced the termination into the record, and it will be with you in the jury room. And it says fired for failure to attend mandatory safety meetings. He lied to you guys about this. He lied to you guys about this so he was directly impeached in the court case.

He is -- and so the only two good jobs he ever had before our company he got fired from.

He is always in trouble with the law, including violating restraining orders, including crime that sent him to jail for six months.

Remember that exchange with him where we went back through an earlier deposition exchange where I said, Have you been jailed in the last 18 months? In his deposition he said, I can't remember. My brain is fried. Anything that happened in my life before 18 months ago is lost to me.

And then he comes up here and speaks the Queen's English and tries to dish some nonsense story to you guys about what happened in this accident. But when I'm trying to discover information about him, he begs off saying, I can't remember anything, even whether I've been jailed in the last 18 months.

The dirt bike -- the significance of the dirt bike is this: What kind of recklessness would it take, while you are healing with screws and plates in your back, to do that?

Can't answer straight questions.

10:45:00

Have you had a motor vehicle accident?
Oh, yeah, only one.
Where?
Marrero.
Are you sure?
Okay, two.
Why did you say one?
Because one was memorable.
Really? The one where you picked glass out of your friend's face was not a memorable experience to you?

10:45:08

And then he was released to return to work at the end of June. Okay? We're now at the end of October, and he's not tried to get any work. No job applications. He can do medium work. What's he doing? Sitting at home living off his maintenance checks and his lawyer loans. Okay? He has an obligation to mitigate his damages.

10:45:27

And remember what he told you? I'm going to wait until I get the plates and screws out of my back. That's an elective surgery. Why hasn't he scheduled it?

10:45:38

We don't have to pay a man damages so he can sit on his couch and live off his lawyer loans. That's not justice.
So that's your man. That's your man.
And then there's Captain Cantu, the expert called by the plaintiff. We haven't heard a word about her yet. Remember what happened there? I said, Are you making credibility

10:45:55

10:46:05 10:46:16 10:46:27 10:46:39 10:46:54

determinations? Because the story that you put in your accident report is only the plaintiff's story.

And she at first said, I don't really understand what you're saying.

I said, Okay. Did you read the deposition of Randy Lepine, the only eyewitness to this accident?

She said, Yes.

I said, What did the only eyewitness say about this accident?

She said, I can't remember.

I said, Well, then let me refresh your recollection.

Remember I put it up on the screen from the deposition.

Question from of plaintiff's lawyer to Randy Lepine (as read): I understand you were an eyewitness to the accident.

Answer: I was watching the whole time, but there was no accident.

So the expert leaves that out of her report.

And I say, So what I'm asking you again is, are you making credibility determinations?

And she said -- I couldn't believe this. I have never heard any expert say this -- I'm here looking at it from the plaintiff's perspective. I said, Well, are you an advocate for the plaintiff? And she said, Well, they're the ones who paid me. Okay?

The idea of -- that is not the role of the expert. The

10:47:12 10:47:30 10:47:45 10:47:59 10:48:16

expert, the Judge is going to charge you, is to come in here and tell you, based on their specialized skill and knowledge, what their objective opinions are.

This is the jury charge. "Specialized training or experience." But also you're not required to accept any expert's opinion. As with any other expert, it's up to you to decide whether you want to believe what they say. Okay?

And I want to explain something to you. I wanted you to hear that this expert may be an expert in container ships or whatever, but I traversed her expertise and cross-examined her, and established she never worked on a tug like this, she never tied onto a platform, she never had to be the person to exercise the discretion, should I tie off or should I wait on weather. She never did anything like this. She doesn't know anything about tug life.

Then I objected to her expertise, and the Judge said, I'm going to allow her -- I'm going to overrule the objection to her expertise and let her testify. But I hope you listened to the rest of what the Judge said then. He said, Subject to your cross-examination, and any shortcomings in her expertise goes to the weight of the evidence.

So just like this charge says, you can decide how much weight to ascribe to her evidence or to Captain Campana's evidence. I would suggest to you she is -- the weight you should apply to her is featherweight and the weight that you should

apply to Captain Campana is heavyweight, because he has done this kind of work his whole life.

And the main thing I want you to focus on, when it comes to the experts, is this: Every single person who's done this work on a tug -- Captain Campana, Randy Lepine, Captain Adams, and Freddy Creppel -- say pulling in a one-and-a-half-inch floating polypropylene hanging-off line, that's what we do.

I've done it hundreds of times -- some of the witnesses said they've done it so many times they can't count.

Without hurting yourself? Yes.

Without a back injury? Yes.

You know, there's suggestions here that maybe he needed training. Their expert didn't say that. Maybe he needed a second man. Their expert didn't say that.

How much time do I have, James?

THE CASE MANAGER: You have seven minutes.

THE COURT: James, give him a three-minute warning.

MR. MCSHANE: So the exercise, when you get into the jury room, because this is a credibility case, what I would suggest to you is you decide who's telling the truth.

As an example, when Mitch [sic] says, I was watching the whole time and there was no accident, but the plaintiff says there were waves crashing over the bow that threw me to the deck, answer the question who's lying. This is your job, to measure

the credibility and answer the question who's lying.

When you have a contest between Captain Adams and Mr. McGraw, and you want to say, Well, who's lying about whether Adams jumped in and helped people out of a bind, decide that.

10:49:45 Decide whether the conversation between Freddy Creppel and the plaintiff took place where Freddy said, You sure you're not still tender from that earlier accident? Decide that credibility determination and put a checkmark next to the person who you think is telling the truth.

10:49:59 The same with Mitch. Mitch gave this guy his best chance, and he's got to sit in this court -- by the way, he asked me to apologize. He can't be here today. He's trying to find work. Okay? He has had to pay $177,000 in medicals and 60-plus thousand dollars in maintenance to this man. And he paid it 10:50:18 because the guy was injured in the service of the vessel, but enough. There is no negligence here. There is no unseaworthiness here. Enough is enough.

This man got his surgery paid for because he injured himself sitting on a bucket. If he injured himself handling a 10:50:33 line doing ordinary, normal seaman's work, fine. He got his money. But there's no negligence there. There's no unseaworthiness there.

You can try to square-peg-round-hole some headline notion into this case. Do you really think it would be in 10:50:47 anybody's best interest to quadruple the line between the vessel

and the platform? Because if you do that, the line's not going to break. Something else is going to break. That's a square-peg-round-hole argument.

10:51:02 And let me tell you something else about this safety manual. They don't even have to have a safety manual. There's no legal requirement for that. You heard from Captain Campana that Mitch is voluntarily participating in Coast Guard inspection regimes. That he's voluntarily participating in the American Waterways Safety regime. He does this voluntarily.

10:51:20 And when you get in a lawsuit, what happened is folks look at the book. It's about this thick (indicating), and they go through it with a fine-tooth comb and they pick out a page that doesn't even apply and make the thinnest of arguments that Mitch should pay more money than he's already paid.

10:51:33 You know, I've been 29 years in the practice of law, and one thing about being an admiralty lawyer is we get to come into the federal courthouse. And I'm going to tell you, I have the highest sense of pride, when it comes to my practice, that I get to do that. You know why? Because this is a hall of justice.

10:51:53 I walked out of here the other night and there was a guy down on the main floor. He was polishing the floor that was already polished. It had the highest patina on it. It looked so fine. And I thought to myself, You know, somebody might look at that and go this is like eight guys looking at a manhole on the

10:52:09

sewerage and water board team, but I don't feel that way. You know why I want that guy to polish that floor? Because this place should glisten. This is where justice is done. This is where Mayor Nagin was sent to jail, and Edwin Edwards was sent to jail, and the most important issues of our time are handled. Civil rights, voting rights, housing rights, discrimination, running the Orleans Parish jail.

This is not a place to come in and dish nonsense and try to sell a jury on a pack of lies. That's what I think is happening here. I'm asking you to render a zero verdict. To tick the boxes to say there is no more responsibility from United Tugs in this case.

Thank you very much.

THE COURT: Thank you, Mr. McShane.

Mr. Falcon, you have --

THE CASE MANAGER: Eleven minutes.

THE COURT: -- eleven minutes.

MR. TIMOTHY FALCON: Okay. A company doesn't even need a safety manual now, a company that completely violates all its safety rules and puts the community at risk. I talked to you about that. That's why juries come.

So the whole motive of this bucket incident versus the other one is, I have this hurt back, it's hurting me for three months, but I'm going to keep working in pain. I'm going to have this problem that's going to need surgery, but I'll keep working

10:54:05 in pain. I'll work 47 days. And then when I find some opportunity for the good accident, the money accident as they call it, the one they've got to pay money when somebody gets hurt when they're negligent -- I'm going to wait for that one. And then when it comes, I'm going to cash in.

Why would a person doing that tell Randy Lepine three days or a month before his big scheme is going to happen, Hey, my back's been hurting the whole time? It would have to be one of those stupidest-criminals-in-the-world situations.

10:54:25 Let's talk about evidence.

What the lawyer testifies to, what the lawyer says, is not evidence. And a good example of that is Mr. McShane was asking questions of Randy Lepine yesterday.

How do you know -- why are you looking at Mr. McGraw

10:54:44 the entire time?

We had a lot of leading questions, a lot of questions trying to put words in his mouth, but this is one that he answered.

Because he could be washed overboard.

10:54:55 You get washed overboard when waves come across the bow. Who's telling the truth?

Look at the loss. Physically there's no way Mr. Lepine could have left the wheelhouse after two lines parted, got to the deck, retied it, had it happen again, and break again. It's

10:55:19 impossible.

So was it a first accident, second accident, or third accident? We know it was the last time they did it, 31 minutes before they left. And what did they do? They left the parted line on the platform. That's the one Mr. McGraw was trying to pick up.

10:55:33

Why do we talk about Coast Guard documents? This is the one they brought to you (indicating). Their own expert didn't know what the instructions were because he couldn't read it.

10:55:45

No signatures. A faulty, illegal document.

Why do I say "illegal"? Because if they would have brought the instructions with them and maybe if they gave the instructions to their own crewmembers, (as read): Disclosure. Furnishing information is mandatory per federal law. Failure to furnish the requested information for occurrences that are reportable marine casualties may result in civil penalty sanctions.

10:56:05

Why did the Coast Guard -- if the Coast Guard would have investigated, they would have found out exactly what happened, as Mr. McGraw's told us.

10:56:21

When the defense cannot rest on the facts, it's two things, attack the poor victim and create confusion and complexity. That's their best friend in these types of cases and that's what they do. Because if they can get the jury confused with their complexity, what happens is your mind freezes,

10:56:42

everybody says I'm confused, I don't know which way to go so I can't render a verdict. No verdict is a loss for the plaintiff.

In this case, a no verdict is endorsement of violating safety rules and putting the community at risk.

10:56:59 So, you know, I've got -- I've got all this (indicating). I'm not going to go through it. What we have to get to is what's fair for Mr. McGraw.

That's the verdict form (indicating).

You're going to have -- again, like I told you, one of
10:57:13 your three jobs is to ask the questions and answer the questions that the Judge will give you.

Did Mr. McGraw prove preponderance? Yes.

Unseaworthiness? Yes.

No rebuttal on that. All he wanted to talk about was
10:57:28 poor Mr. McGraw and confusion. And if the first one wasn't a good case, the second one isn't.

There's no rebuttal. I think we've proven that beyond a reasonable doubt, which is not required. We just have to prove a little more right than wrong, and we've done that.

10:57:43 Yes.

Yes.

The next one is did Mr. McGraw do anything wrong, contributory negligence?

No argument from counsel that you should put any
10:57:54 contributory negligence. Why? The captain says he didn't do

anything wrong. The mate says he didn't do anything wrong. Mr. Campana said he didn't do anything wrong.

If anybody wants to put contributory negligence, remind them the captain said he didn't doing anything wrong. The mate said he didn't do anything wrong. There's no evidence he did anything wrong.

No.

Skip to the next question.

Damages. We asked you and we said in the beginning, we're not looking for anything outside the box, only the harms and losses this man suffered.

Was he unconscious? We're not asking for those damages. That's the confusion they're trying to bring in here. What's the injury we're here for? The man injured his lower back. Mr. McGraw had to undergo surgery, and that surgery, he was left with rods and screws that either -- should stay there or could possibly be taken out. That damage is for life.

Dr. Todd was hired by the defendant to testify in this case. Did the defendant call him? No, I called him. Because what did he tell us? The truth. The accident caused the injury. He needs surgery. We're not going to get surgery until he gets cleared.

And, quite frankly, Clinton went through a terrible time getting the surgery. The accident was in June. He's not cleared for surgery until two years later. He's going through

psychiatric care to try to get him well. Three years later, he is finally at maximum medical improvement.

Do you know what's going on back on that boat for those three years? They're all working, they're moving on. What Clinton would probably have been doing if he was on the boat for the last three years and not suffering through what he's going through being trained to be a mate.

Who said he could do it? Captain Lepine. "He's a good guy. He probably could do it."

What does that mean? You go from $210 a day to $500 a day. That's a hundred-and-something thousand dollars a year. Mr. McGraw earned that right. He worked for that. Look at his employment file. It's in the record.

His employment file. Hired August 13, 2013. He worked all the way through until he was injured in June. Took four months to get on with the company, to actually have to fill out that application. Worked on there, proved himself.

Mr. Eymard, except for the lawyer saying he has a criminal record, would have never said anything about the criminal record.

So where are we left? A man has had three years of pain and suffering and a man that's left without the best career he ever would have had, the life-changing career that redeemed this man. And he wanted redemption. Now he's got to go back and find some other way.

But when he goes back and finds some other way, he's stuck with that back, stuck with those restrictions. He'll never work out there again.

THE CASE MANAGER: You have three minutes.

11:01:02 MR. TIMOTHY FALCON: Thank you.

So you can fill out the first numbers, but let's talk about the lost wages and fringe benefits.

According to Dr. Boudreaux, this man has zero losses the rest of his life.

11:01:29 Or does he have reasonable, well-put-together-based-on-proper-methodology numbers?

What do these numbers represent? Income from the time he got hurt to trial and what he's going to lose for the rest of his life discounted to present value. That means it's not money 11:01:47 that he gets paid every year or whatever. He has to invest that, he has to take care of it, to replace his lost income stream.

And you know what those numbers are? They're with him going back to work. We're not asking you to say he's going to sit around the rest of his life. This is even if he goes back to 11:02:03 work based on jobs that both vocational rehabilitation counselors talked about. Those are the numbers.

We also -- there's a loss of medical benefits. You'll see in his application dental, health, retirement. That was a nice job with those benefits. And you have to calculate the loss 11:02:21 of those benefits because he's not going to get those in the jobs

he can get. That's the cost to him to replace that.

And there's two different scenarios. It's your province to decide what you do.

But what we didn't do is say how much is he really going to lose if he doesn't become a mate. That's a -- based on this trial, it's a fact that as a mate, he would lose $500 a day. That could double those numbers. Here's the numbers based on our methodology that we feel is fair.

Next we're going to talk about past physical and emotional pain and suffering.

There are two ways to look at pain and suffering. Acute, hard pain that you're going through for a while. How long does that last? And maybe pain that's not so acute or so high. Maybe -- here's a 7 or 8 (indicating). Here's a 2 (indicating). The 7 or 8 lasted for three years and he got cleared. Higher intensity, shorter duration.

The lower one, the 2 or the 3, the loss of riding his bike, wrestling with his son, doing the activities he did before -- you know, he was a tough guy, an MMA fighter. He fought for life. You know, the man lost a lot of battles, mostly with the court system, but he got out of it. But he's a fighter and he got a job. And he loved the physical activity of that job. He loved being on those boats. That's gone.

So you've got that past three years. What's that is worth? And you've got the rest of his life.

Dr. Todd said it's a lifetime worth of pain and suffering, a lifetime worth of missing the things you love.

THE CASE MANAGER: Time.

MR. TIMOTHY FALCON: The numbers that we suggest, past is $500,000, and future, $500,000 or more depending on you. That will fairly compensate him for the harms and losses.

A verdict for the plaintiff will make this community safer. A verdict for the defendant will leave us all at risk.

Thank you.

THE COURT: Ladies and gentlemen, we're now going to pass out the instructions to you and you can follow along as I read them to you.

(A pause in the proceeding.)

THE COURT: Members of the jury, you have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you, the jury, are the judges of the facts. Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

You have heard the closing arguments of the attorneys. Statements and arguments of the attorneys are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

11:05:39 11:05:58 11:06:14 11:06:31 11:06:51

Answer each question on the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

In this case, the plaintiff must prove every essential part of his claim by a preponderance of the evidence. By this is meant the greater weight and degree of credible evidence before you. In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so.

In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. If the proof fails to establish any essential part of the plaintiff's claim by a preponderance of the evidence, you should find for the defendant as to that claim.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

11:07:05 You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it because people may forget some things or remember other things inaccurately. So if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory, and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

11:07:24 While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to 11:07:41 draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other 11:07:58 evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence, the proof of a 11:08:14 chain of circumstances that indicates the existence or

nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts through a preponderance of all of the evidence, both direct and circumstantial.

11:08:33

Witnesses.

You alone are to determine the questions of credibility or truthfulness of the witnesses. In weighing the testimony of witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case that he or she may have, and the consistency or inconsistency of his or her testimony considered in light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times or places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

11:08:47 11:09:07

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or any inference that may be drawn from the evidence if you believe the testimony.

11:09:23

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed, witnesses are not counted. The test is not

11:09:38

the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

11:09:57

Expert Witnesses.

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it.

11:10:13

Jones Act - Unseaworthiness - Maintenance and Cure.

Plaintiff, Clinton McGraw, a seaman, has asserted three separate claims against defendant, United Tugs, Inc.

11:10:31

The plaintiff's first claim under the federal law known as the Jones Act is that his employer, defendant, United Tugs, Inc., was negligent, and that this negligence was a cause of his injuries. The plaintiff's second claim is that unseaworthiness of a vessel caused his injuries. The plaintiff's third claim is for what is called maintenance and cure. This third claim has been resolved.

11:10:49

You must consider each of the first two remaining claims separately. The plaintiff is not required to prove both of these claims. He may recover if he proves either of them.

11:11:02

However, he may recover only those damages or benefits the law provides for the claims that he proves, and he may not recover the same damages or benefits more than once.

Jones Act Negligence.

11:11:20 Under the Jones Act, the plaintiff must prove that his employer was negligent. Negligence is doing an act that a reasonably prudent person would not do or failing to do something that a reasonably prudent person would do under the same or similar circumstances. The occurrence of an accident standing 11:11:41 alone does not mean that anyone was negligent or that anyone's negligence caused the accident.

In a Jones Act claim, the word "negligence" is liberally interpreted. It includes any breach of duty that an employer owes to its employees who are seamen, including the duty 11:12:00 of providing for the safety of the crew. Under the Jones Act, if the employer's negligent act was the cause in whole or in part of injury to a seaman employee, then you must find that the employer is liable under the Jones Act. In other words, under the Jones Act, the defendant bears the responsibility for any negligence 11:12:20 that played a part, however slight, in causing the plaintiff's injury.

Negligence under the Jones Act may consist of a failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to 11:12:36 work. If you find that the plaintiff was injured because the

defendant failed to furnish him with a reasonably safe place to work, and that the plaintiff's working conditions could have been made safe through the exercise of reasonable care, then you must find that the defendant was negligent.

11:12:54 The fact that the defendant conducted its operations in a manner similar to that of other companies is not conclusive as to whether the defendant was negligent or not.

You must determine if the operation in question was reasonably safe under the circumstances. The fact that a certain 11:13:13 practice had been continued for a long period of time does not necessarily mean that it is reasonably safe under all circumstances. A long-accepted practice may be an unsafe practice. A practice is not necessarily unsafe or unreasonable, however, merely because it injures someone.

11:13:31 A seaman's employer is legally responsible for the negligence of one of his employees while an employee is acting within the course and scope of his employment.

If you find from a preponderance of the evidence that the defendant assigned the plaintiff to perform a task that the 11:13:49 plaintiff was not adequately trained to perform, you must find that the defendant was negligent.

Unseaworthiness.

The plaintiff seeks damages for personal injury that he claims was caused by the unseaworthiness of the defendant's 11:14:04 vessel, the M/V EMILE T.

A shipowner owes every member of the crew employed on its vessel the absolute duty to keep and maintain the vessel and all its decks and passageways, appliances, gear, tools, parts, and the equipment in a seaworthy condition at all times.

11:14:26 A seaworthy vessel is one that is -- let me start over.

A seaworthy vessel is one that is reasonably fit for its intended use. The duty to provide a seaworthy vessel is absolute because the owner may not delegate that duty to anyone. Liability for an unseaworthy condition does not in any way depend

11:14:47 on negligence or fault or blame. If an owner does not provide a seaworthy vessel, a vessel that is reasonably fit for its intended use, no amount of care or prudence excuses the employer.

The duty to provide a seaworthy vessel includes the duty to supply an adequate and competent crew. A vessel may be

11:15:10 unseaworthy even though it has a numerically adequate crew if too few persons are assigned to a given task.

However, the vessel owner is not required to furnish an accident-free ship. It need only furnish a vessel and appurtenances that are reasonably fit for the intended use and a

11:15:31 crew that is reasonably adequate for the assigned tasks.

The vessel owner is not required to provide the best appliances and equipment or the finest crews on his vessel. He is required to provide only gear that is reasonably proper and suitable for its intended use and a crew that is reasonably

11:15:50 adequate.

In summary, if you find that the vessel owner did not provide an adequate crew of sufficient number to perform the tasks required, or if you find that the vessel was in any manner unfit under the law as I've explained it to you, and that this was a proximate cause of the injury, a term I will explain to you, then you may find that the vessel was unseaworthy, and the vessel owner liable, without considering any negligence on the part of the vessel owner or any of its employees.

However, if you find that the owner had a capable crew and they had appliances and gear that were safe and suitable for their intended use, then the vessel was not unseaworthy and the defendant is not liable to the plaintiff on the claim of unseaworthiness.

Causation.

Not every injury that follows an accident necessarily results from it. The accident must be the cause of the injury.

In determining causation, different rules apply to the Jones Act and to the unseaworthiness claim.

Under the Jones Act, for both the employer's negligence and the seaman's contributory negligence, an injury or damage is considered caused by an act, or failure to act, if the act or omission brought about or actually caused the injury or damage, in whole or in part. In other words, under the Jones Act, a defendant and a plaintiff each bear the responsibility for any negligence that played a part, however slight, in causing the

plaintiff's injury.

For the unseaworthiness claim, the seaman must show not merely -- let me start over.

For the unseaworthiness claim, the seaman must show not merely that the unseaworthy condition was the cause of the injury, but that such condition was a proximate cause of the injury. This means that the plaintiff must show that the condition in question played a substantial part in bringing about or actually causing his injury, and that the injury was either a direct result or a reasonably probable consequence of the condition.

Contributory negligence.

The defendant contends that the plaintiff was negligent and that the plaintiff's negligence caused or contributed to causing his injury. This is the defense of contributory negligence. The plaintiff's negligence will be considered a cause of the injury if it played a part, no matter how slight, in bringing about his injury. The defendant has a burden of proving that the plaintiff was contributorily negligent. If the plaintiff's negligence contributed to his injury, he may still recover damages but the amount of his recovery will be reduced by the extent of his contributory negligence.

A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his

11:19:15 employer to provide a safe work environment, but also his own experience, training, and education. Under the Jones Act, a seaman has the duty to exercise that degree of care for his own safety that a reasonable seaman would exercise in like circumstances.

If you find that the defendant was negligent or that the vessel was unseaworthy, and that the negligence or unseaworthiness was a proximate cause of the plaintiff's injury, but you also find that the accident was due partly to the 11:19:31 plaintiff's contributory negligence, then you must determine the percentage the plaintiff's negligence contributed to the accident. You will provide this information by filling in the appropriate blanks in the jury questions. Do not make any reduction in the amount of damages that you award to the 11:19:50 plaintiff. It is my job to reduce any damages that you award by any percentage of contributory negligence that you assign to the plaintiff.

Damages.

If you find that the defendant is liable, you must 11:20:04 award the amount you find by a preponderance of the evidence as full and just compensation for all of the plaintiff's damages.

Compensatory damages are not allowed as a punishment against a party. Such damages cannot be based on speculation because compensatory damages must be actual damages to be 11:20:26 recoverable. But compensatory damages are not restricted to

11:20:48 11:21:02 11:21:20 11:21:33 11:21:54

out-of-pocket losses of money or lost time. Instead, compensatory damages may include mental and physical aspects of injury, tangible and intangible. Compensatory damages are intended to make the plaintiff whole or to restore him to the position he would have been in if the accident had not happened.

In determining compensatory damages, you should consider only the following elements to the extent you find that the plaintiff has established them by a preponderance of the evidence:

Past and future physical pain and suffering including physical disability, impairment, and inconvenience, and the effect of the plaintiff's injuries and inconvenience on the normal pursuits and pleasures of life.

Past and future mental anguish and feelings of economic insecurity caused by disability.

Income loss in the past.

Impairment of earning capacity or ability in the future, including impairment of the plaintiff's earning capacity due to his physical condition.

If you find that the plaintiff is entitled to an award of damages for loss of past or future earnings, there are two particular factors you must consider. First, you should consider loss after income taxes. That is, you should determine the actual or net income that the plaintiff has lost or will lose taking into consideration that any past or future earnings would

be subject to income taxes. You must award the plaintiff only his net earnings after tax. This is so because any award you may make here is not subject to income tax. The federal or state government will not tax any amount that you award on this basis.

11:22:16 Second, an amount to cover a future loss of earnings is more valuable to the plaintiff if he received the amount today than if he received the same amount in the future. If you decide to award the plaintiff an amount for lost future earnings, you must discount that amount to present value by considering what 11:22:41 return will be realized on a relatively risk-free investment and deducting that amount from the gross future earning award.

However, some of these damages, such as mental or physical pain and suffering, are intangible things about which no evidence of value is required. In awarding these damages, you 11:23:00 are not determining value. Instead, you are determining what amount will fairly compensate the plaintiff for his injuries.

Mitigation of Damages.

A person who claims damages resulting from the wrongful act of another has a duty under the law to use reasonable 11:23:17 diligence to mitigate his damages, that is, to avoid or to minimize those damages.

If you find the defendant is liable and the plaintiff has suffered damages, the plaintiff may not recover for any item of damage which he could have avoided through reasonable effort. 11:23:33 If you find that the defendant proved by a preponderance of the

evidence that plaintiff unreasonably failed to take advantage of an opportunity to lessen his damages, you should deny him recovery for those damages that he would have avoided had he taken advantage of the opportunity.

11:23:51 You are the sole judge of whether the plaintiff acted reasonably in avoiding or minimizing his damages. An injured plaintiff may not sit idly by when presented with an opportunity to reduce his damages. However, he is not required to exercise unreasonable efforts or incur unreasonable expenses in mitigating the damages. 11:24:12 The defendant has the burden of proving the damages that the plaintiff could have mitigated. In deciding whether to reduce the plaintiff's damages because of his failure to mitigate, you must weigh all the evidence in light of the particular circumstances of the case using sound discretion in deciding whether the defendant has satisfied its burden of 11:24:31 proving that the plaintiff's conduct was not reasonable.

Maintenance and Cure.

The plaintiff's third claim, which has been resolved, was that, as a seaman, he's entitled to recover maintenance and cure. 11:24:49 This claim is separate and independent from both the Jones Act and the unseaworthiness claim.

Maintenance and cure provides a seaman who is disabled by injury or illness while in the ship's service, with medical care and treatment and the means of the maintaining himself while he is recuperating. 11:25:07

11:25:21 11:25:41 11:26:00 11:26:19 11:26:36

A seaman is entitled to maintenance and cure even though he was not injured as a result of any negligence on the part of his employer or any unseaworthy condition of the vessel. To recover maintenance and cure, the plaintiff need only show that he suffered injury or illness while in the service of the vessel on which he was employed as a seaman without willful misbehavior on his part. The injury or illness need not be work related; it need only occur while the seaman is in the ship's service. Maintenance and cure may not be reduced because of any negligence on the seaman's part.

The "cure" to which a seaman may be entitled includes the cost of medical attention, including the services of physicians and nurses, as well as hospitalization, medicines, and medical apparatus. However, the employer has no duty to provide cure for any period during which a seaman is hospitalized at the employer's expense.

Maintenance is the cost of food, lodging, and transportation to and from a medical facility. A seaman is not entitled to maintenance for any period that he is an inpatient in any hospital because the cure provided by the employer through hospitalization includes the seaman's food and lodging.

As has been stipulated by both parties, United Tugs, Inc. has paid maintenance and cure benefits pursuant to United Tugs, Inc.'s maintenance and cure obligation for injuries sustained by McGraw while in the service of a United Tugs, Inc.'s

11:26:54
11:27:14
11:27:32
11:27:47
11:28:06

vessel.

Consider Damages Only If Necessary.

If the plaintiff has proven his claim against the defendant by a preponderance of the evidence, you must determine the damages to which the plaintiff is entitled. You should not interpret the fact that I have given instructions about the plaintiff's damages as an indication in any way that I believe that the plaintiff should or should not win this case. It is your task, first, to decide whether the defendant is liable. I'm instructing you on damages only so that you will have guidance in the event you decide that the defendant is liable and that the plaintiff is entitled to recover money from the defendant.

Bias - Corporate Party Involved.

Do not let bias, prejudice, or sympathy play any part in your deliberations. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

No Inference From Filing Suit.

The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment. Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit by itself does not in any way tend to establish that claim and is not evidence.

Duty to Deliberate.

It is your sworn duty as jurors to discuss the case

11:28:24
11:28:43
11:28:59
11:29:19
11:29:35

with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to reexamine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently or merely to finish the case.

Remember that in a very real way, you are the judges, judges of the facts. Your only interest is to seek the truth from the evidence in the case.

Instructions On Deliberation.

When you retire to the jury room to deliberate on your verdict, you may take this charge with you. The case manager will bring you the exhibits which the Court has admitted into evidence. Select your foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during the trial. After you have reached your unanimous verdict, your foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please

11:29:53 give a written message or question to the bailiff who will bring it to me. I will then respond as promptly as possible, either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise.

11:30:05 The time is 11:30. You may now retire to the jury room to conduct your deliberations.

Mr. Crull will bring you the menus as well for lunch. You can start deliberating immediately, and when your meal comes, obviously you can continue with your deliberation during

11:30:25 lunchtime.

Thank you very much.

(Jury out at 11:30 a.m.)

THE COURT: Thank you. The jury is now out.

Does the plaintiff need to put anything on the record?

11:31:01 MR. TIMOTHY FALCON: No, sir.

THE COURT: Defense need to put anything on the record?

MR. MCSHANE: No, Your Honor.

THE COURT: Thank you very much. Off the record.

(A recess was taken.)

11:31:11 **AFTER THE RECESS**

(Call to order of the court.)

THE CASE MANAGER: We are on a conference call.

Everybody, we have Mary Thompson, the court reporter, here also. We're ready to go.

01:26:06 THE COURT: All right, good.

Go ahead, James, and read me the first question.

THE CASE MANAGER: The first question: Were the pictures taken by Captain Campana entered as evidence? And if so, can we see them?

01:26:38 MR. TIMOTHY FALCON: This is Timothy Falcon, and they were not entered into evidence.

THE COURT: All right.

THE CASE MANAGER: The second question is related --

THE COURT: Wait, wait, wait, wait, wait, wait, wait, 01:26:49 James.

Pat, do you agree with that?

MR. MCSHANE: Yes, Your Honor.

THE COURT: Okay. Good.

And I just want it to be on the record. I'm out of the 01:27:00 office now, but I have to give them a response so, James, write down the response, and, with the lawyer's permission, I will sign it as soon as I get back to the office. But I don't want them to be delayed in getting my response. My response would be: The pictures were not admitted into evidence, period.

01:27:21 Is that --

MR. MCSHANE: Judge, this is Pat. Lara is telling me there were two pictures that we used for the tugboat. One was a side view like a profile. The other one was --

MR. TIMOTHY FALCON: Those are -- Pat, those are not the pictures. The answer is "no." Those were not the pictures.

01:27:37

MR. MCSHANE: Let me finish my sentence, please.

Judge?

THE COURT: Yeah, I'm listening.

MR. MCSHANE: Judge, there are two photographs of the tugboat. One is a picture that I took in Mitch's office off of an eight-by-ten glossy with my phone. That's the side picture.

01:27:52

The picture looking at the tugboat from the front is off the cover of Captain Campana's report.

So they have one picture from Captain Campana. It is the picture from the front looking at the tugboat. It's either in Exhibit 16 or 17.

01:28:11

That's what I wanted to clarify. They have one picture from Captain Campana.

THE COURT: We can keep this very simple. You-all got together and you-all gave James the exhibits, and the exhibits are in the exhibit --

01:28:25

James, the exhibits are in the jury room right now, correct?

THE CASE MANAGER: Yes, sir.

THE COURT: I think all we need to say, then, without

01:28:35

01:28:54 01:29:12 01:29:23 01:29:34 01:29:51

trying to pinpoint anything -- why don't we just merely say, You have all of the exhibits in front of you, and just leave it like that? So we don't get confused as to what pictures or where or whatever. Say: All of the exhibits that have been admitted into evidence are in the binder in the jury room.

How does that sound to you, Tim, because I think that's going to answer the second question, too? They have already read the questions to me.

Tim, is that okay with you?

MR. TIMOTHY FALCON: Yes, that's fine.

THE COURT: Pat, is that okay with you?

MR. MCSHANE: I mean, I'd prefer that they know -- they're asking whether they have a Campana photo and the answer is that they do have one.

THE COURT: No --

MR. TIMOTHY FALCON: No, that's not the evidence. The picture was --

THE COURT: But you guys aren't agreeing on that and I'm not going to, by way of an answer, make a comment as to what they have and don't have.

So the questions they asked are, you know, are these particular pictures in the exhibit book, and I'm going to merely refer them to the exhibit book. And they are going to have to figure it out themselves. I think anything beyond that would not be proper.

James, if you'll write this down, I'll dictate it to you now.

THE CASE MANAGER: Sure.

THE COURT: And then bring it to them unsigned, after I 01:30:00 get the approval or the objections by counsel, and then when I get back, I'll sign it at the appropriate time.

First off, before I do that, does any counsel have any objection to my not signing it right now?

MR. MCSHANE: No.

01:30:17 THE COURT: Because if you have an objection, I'll go back to the office and do it.

MR. MCSHANE: No, no, no.

MR. TIMOTHY FALCON: No, no.

THE COURT: Tim, you don't have an objection?

01:30:25 MR. TIMOTHY FALCON: No, sir.

THE COURT: You might object to the content, which is fine, but I'm going to answer as follows: All of the pictures that are in evidence are in your possession in the jury deliberation room.

01:30:49 And I think that way I'm not commenting on anything, I'm not pointing to anything, and I'm responding to their question and they're going to have to figure that out themselves. Because unless you guys agree that they were or they're not. If you don't, I'm going to say basically what I just dictated.

01:31:08 Any objection, Tim, to what I just dictated?

MR. TIMOTHY FALCON: No, sir.
THE COURT: Any objection, Pat?
MR. MCSHANE: There is, Judge. We object because there is no basis for contending that's not a Campana photo. Of course it is. It is a Campana photo. There's no dispute about that. There's nowhere else it came from. It's on the cover of his expert report. That's where it came from.
And the problem that we have with what you are suggesting is the absence of the Campana photos is something they might blame me for, and I didn't offer them.
But -- so, you know, if there is a Campana photo and the answer is "we're not going to tell you there is a Campana photo," that could reflect negatively on me. So I would rather they be told there is a Campana photo because there is a Campana photo in their exhibit book.
MR. TIMOTHY FALCON: We don't know that.
MR. MCSHANE: Yes, it is from Campana. You keep saying that, Tim. You know...
MR. TIMOTHY FALCON: Pat, first of all, you objected to them going in on the record in front of the jury.
MR. MCSHANE: That's right.
MR. TIMOTHY FALCON: That's what happened.
MR. MCSHANE: But they have a Campana photo.
THE COURT: Hold on, fellows.
Pat, regardless of whether you objected to it going in,

01:32:34 01:32:51 01:33:14 01:33:29 01:33:38

if I allowed them to go in, then they are in. So that would not be the basis for me to not be more specific.

Now that they're in and your objection is noted for the record, and it's preserved for appeal, is the answer to the question yes or no? I mean, it's very simple. Is the question yes or no?

If you guys can agree, then I'll answer the question yes or no. But if you can't agree, I'm going to say exactly what I did, because anything else would be a comment by me.

It would be me siding with one side or the other as to whether or not it's in there, and I'm not going to do that.

So, Tim, I mean, you objected to the photo. We got that. Apparently I overruled the objection and I allowed the photo in evidence. So it's there. Now, is that the photo that is the Campana photo that they are asking about? I mean, is that in their book?

MR. TIMOTHY FALCON: No, there was a set of photos that were attached to his report that I was going to use with Captain Campana, and Pat objected to me using those and so I didn't use them.

So the answer as to the Campana photos is no, and we're not going to agree to the yes answer.

THE COURT: Okay. Since you are not agreeing, I'll note --

MR. TIMOTHY FALCON: We accept your instruction as you

01:33:54 01:34:11 01:34:24 01:34:41 01:34:57

read it, Judge.

MR. MCSHANE: May I just make an observation about this before you rule? May I make an observation about this?

Just take a step back, because I want to be more precise about what the situation is.

There were a series of photos that had four small pictures on each 8-by-11 page, some number of pages like that. So call it -- this is an estimate -- 20 pictures from Campana. The plaintiff wanted to add those at the 11th hour after the pretrial conference, and we said no.

And, Judge, you ruled them out because they were late. That's all.

So there are two different issues here. There's these 20 small pictures, and then there is a separate Campana photo that is in the jury room right now. It's a picture of the tug. It's just a picture of the tug from the front looking at it. It's the one you can see the stairs going up and all that. That is a Campana photo.

So we're talking apples and oranges here. When Tim said, Pat objected to it, I put that photo in evidence. I didn't object to it. It's in evidence and in the jury room.

So the answer to "do we have Campana photos" is not no, it's yes. Of course. They have got one in the room.

THE COURT: Fine. I'm not going to make a comment on the evidence before them. I'll note your objection, Pat, but

the -- James, read back the statement that I dictated to you that will be presented to the jury.

THE CASE MANAGER: "All of the pictures that are in evidence are in your possession in the jury deliberation room."

01:35:17 THE COURT: Okay. Well, that's it. I'll note your objection, Pat, but that's -- they just have to consider those pictures there without the source. They are admitted into evidence.

And I'll note your objection, Pat.

01:35:32 MR. MCSHANE: Thank you, Judge.

THE COURT: Question No. 2?

THE CASE MANAGER: Question No. 2: Can we see pictures of the boat shown during the trial?

THE COURT: Well, really, that's the same answer as the 01:35:45 answer number one. They can only see what's admitted into evidence. And, again, you guys got together and put in the book the evidence that was going to go to the jury.

So I propose that is my answer No. 2 is the same exact as my answer No. 1.

01:36:01 Any objection to that?

MR. TIMOTHY FALCON: No, sir.

THE COURT: Any objection, Pat?

MR. MCSHANE: There are two photos. If they're asking to see the photos -- this is a little bit concerning, because if 01:36:11 they're asking to see the photos that were used in the trial,

there were only two and they are in the room with them. So do they not understand that there are two bench books and that these photos are Exhibits 16 and 17?

Can we tell them, The photos are Exhibits 16 and 17 in your book?

01:36:27

They have them and they seem to be thinking that they don't have them.

Maybe we could say, The only two photos used at trial are Exhibits 16 and 17 in your book, so they know that they actually have them. Those are the photos used in the trial.

01:36:40

THE COURT: Here's what I propose -- Tim, do you have any objection? I think that's very fair.

MR. TIMOTHY FALCON: That's fine.

THE COURT: Okay.

MR. MCSHANE: Okay.

01:36:50

THE COURT: Okay. What my answer to No. 2 will be is: The only photos admitted into evidence are in the evidence book in your possession, comma, Exhibit Nos. 16 and 17.

These are the numbers?

MR. MCSHANE: Lara is double checking. I don't have an exhibit list in front of me.

01:37:12

James -- do you have an exhibit list, James?

THE CASE MANAGER: No, sir.

MR. MCSHANE: Okay.

THE COURT: Now, again, those are the only

01:37:23

photographs -- if they are the only photographs in the exhibit book, I don't think we need to give them a number. They are where they are.

MR. TIMOTHY FALCON: I think the first answer like you said is probably the correct answer. The same answer to the first question.

01:37:37

THE COURT: Well, I --

MR. TIMOTHY FALCON: This is --

THE COURT: I think Nos. 16 and 17 is what I'm waiting on. I'm going to respond the way I just dictated to you, and if you can confirm that those are the numbers, 16 and 17, then I will include them. If you can't confirm that, I do not want to confuse this jury. I am just not going to refer to the number. I'm just going to say the pictures -- the only two pictures in the exhibit book were admitted into evidence.

01:38:00

01:38:20

I mean, are those the only pictures admitted into evidence?

MR. TIMOTHY FALCON: Mr. Sprague said they are 16 and 17.

THE COURT: Okay. James, did you write down what I said my answer was going to be?

01:38:33

THE CASE MANAGER: Pam wrote it down. I'll repeat it.

"The only photos admitted into evidence are in the evidence book in your possession, Exhibit s 16 and 17."

THE COURT: Any objection, Tim?

01:38:51

01:39:02 01:39:09 01:39:25 01:39:36 01:39:47

MR. TIMOTHY FALCON: No, sir.
THE COURT: Any objection, Pat?
MR. MCSHANE: The only thing I will say, Judge, is I'm having trouble hearing Tim's line. Did he say he has confirmed those are the right exhibit numbers?
MR. TIMOTHY FALCON: Yes.
MR. MCSHANE: I'm going on reckoning on that. If that's a yes, then I have no objection.
Is that a yes, Tim?
MR. TIMOTHY FALCON: Yes.
MR. MCSHANE: It's just hard to hear you.
THE COURT: Yes. Well, Tim says "yes" but that can really be easily confirmed.
James, do you have an extra book?
I mean, y'all can just look at the index and confirm it's Nos. 16 and 17.
MR. MCSHANE: I think Tim is saying he did that.
THE COURT: Okay. That's great, then.
MR. TIMOTHY FALCON: Well, yeah.
THE COURT: Look, are you absolutely sure?
Look, I don't want to screw up by putting the numbers down. I don't think we need to put the numbers down if we're now -- well, I don't want to put the numbers down if we're not absolutely a hundred percent sure those are the numbers.
If these were the only pictures, they can look for the

pictures themselves in the book, you know.
MR. TIMOTHY FALCON: Yes.
MR. MCSHANE: Yeah. We just need somebody who is standing near the exhibit list to tell us what the numbers are.
01:39:59 THE CASE MANAGER: We don't have an exhibit list, Mr. McShane.
MR. MCSHANE: I know. I know. I was talking to Tim.
THE COURT: Let me ask you this: James, is there an exhibit list in front of the exhibit book that the jurors have or
01:40:10 no?
THE CASE MANAGER: No, because that's not evidence.
THE COURT: Right. Okay. That makes sense.
Well, I don't want to put numbers down if those aren't a hundred percent accurate numbers, because they are going to be
01:40:25 looking at exhibit whatever and it's not a picture and that's going to be completely confusing to them, which really wouldn't be fair to them. And certainly I don't want to commit an error on this issue.
So what I'm going to do is, unless you-all agree, I'm
01:40:40 not going to refer to the numbers of the exhibits, but I'm merely going to respond the way that I previously dictated, that they are in the book in front of them, period.
I'm not going to refer them to 16 and 17 unless you-all agree that those are the exact numbers. And if you're not sure,
01:41:00 I would rather err on the side of not listing them and let them

fend for themselves, which is their job to do anyway.

MR. MCSHANE: So we would say the two photos in the exhibits we have given you?

THE COURT: In the exhibit book. They will have to go through it page by page, perhaps.

01:41:13

MR. MCSHANE: That's fine.

THE COURT: But I'm not going to commit an error because I'm giving them a wrong number even though all of us are in good faith giving --

01:41:21

MR. MCSHANE: Yeah, I agree.

THE COURT: So, James, dictate -- read it to us one last time excluding reference to the numbers.

THE CASE MANAGER: "The only photos admitted into evidence are in the evidence book in your possession."

01:41:38

THE COURT: Period. Okay.

Any objection, Tim?

MR. TIMOTHY FALCON: No, sir.

THE COURT: Any objection, Pat?

MR. MCSHANE: Was that "no objection" from the plaintiff?

01:41:47

THE COURT: Correct. Tim did not object.

MR. MCSHANE: No, I don't object. That's fine.

THE COURT: Okay. Defense counsel does not object, either. All right.

01:41:54

And, again, I have your permission to send my unsigned

responses that I've just dictated to you, to them without my signing them right now, but as soon as I get back to the office --

MR. MCSHANE: Yes.

01:42:08 THE COURT: As soon as we get back into court on the record, I'll sign them. Is that --

MR. MCSHANE: Yes.

THE COURT: Is that okay with you, Tim?

MR. TIMOTHY FALCON: Yes.

01:42:15 THE COURT: Okay, Pat. Okay with you, Tim?

MR. TIMOTHY FALCON: Yes.

THE COURT: All right. Great. Thank you guys very much.

MR. MCSHANE: Thanks, Judge.

01:42:22 THE COURT: Thank you James, Mary, and Pam.

THE CASE MANAGER: Thank you.

(A recess was taken.)

**AFTER THE RECESS**

(Call to order of the court.)

01:43:35 THE COURT: Just bring in the jury.

(Jury in at 3:20 p.m.)

THE COURT: Welcome back. Has the jury reached a verdict?

THE FOREPERSON: We have, Your Honor.

03:22:02 THE COURT: Please have a seat and give the verdict to

03:22:47 03:23:06 03:23:25 03:23:41 03:24:01

Mr. Crull.

THE FOREPERSON: (Complies.)

(A pause in the proceeding.)

THE COURT: James.

THE CASE MANAGER: This is Civil Action 15-394, *Clinton McGraw v United Tugs, Inc.*

Jones Act, Question 1: Did the plaintiff, Clinton McGraw, prove by a preponderance of the evidence that United Tugs, Inc., was negligent on June 27, 2014, in a manner which was a cause of injury in whole or in part to him?

Answer: Yes.

Unseaworthiness, Question 2: Did the plaintiff, Clinton McGraw, prove by a preponderance of the evidence that the M/V EMILE T was unseaworthy on June 27, 2014, in a manner which was a cause of injury to him?

Answer: No.

Contributory negligence, Question 3: Did the defendant, United Tugs, Inc., prove by a preponderance of the evidence that any negligence of the plaintiff, Clinton McGraw, caused or contributed to the accident on June 27, 2014?

Answer: No.

Question No. 4 is unanswered.

Damages, Question 5: What amount, if any, do you find by a preponderance of the evidence will fully and justly compensate the plaintiff, Clinton McGraw, for his injuries?

03:24:16
Past physical and emotional pain and suffering, $100,000.

Future physical and emotional pain and suffering, $125,000.

Past loss of wages and fringe benefits, zero.

Future loss of wages and fringe benefits, $100,000.

This is signed and dated by the foreperson.

THE COURT: Does either party request polling of the jury?

03:24:35
MR. TIMOTHY FALCON: No, sir.

MR. MCSHANE: Yes, Your Honor.

THE COURT: Okay.

THE CASE MANAGER: Ms. Elsky, is this your verdict?

THE JUROR: Yes, it is.

03:24:42
THE CASE MANAGER: Ms. Stouling, is that your verdict?

THE JUROR: Yes, it is.

THE CASE MANAGER: Mr. McDonald, is this your verdict?

THE JUROR: Yes.

THE CASE MANAGER: Ms. Kain, is this your verdict?

03:24:51
THE COURT: You skipped over someone.

THE CASE MANAGER: I'll come back to him.

THE COURT: All right.

THE CASE MANAGER: Mr. DeRoche, is this your verdict?

THE JUROR: Yes, it is.

03:24:59
THE CASE MANAGER: Ms. Kain, is this your verdict?

THE JUROR: Yes.
THE CASE MANAGER: Ms. Etienne, is this your verdict?
THE JUROR: Yes.
THE CASE MANAGER: And Ms. Kamentani-Rider, is this your verdict?
03:25:06
THE JUROR: Yes.
THE COURT: Okay. Let the record reflect that the jury was unanimous after being polled in open court.

Ladies and gentlemen, pursuant to local Rule 47.5 of this court, I now instruct you that a juror has no obligation to speak to any person about any case and may refuse all interviews or requests for comments.
03:25:16

Attorneys and parties to an action, or anyone acting on their behalf, are prohibited from speaking with, examining, or interviewing any juror regarding the proceeding except with leave of court. If leave of court is granted, it shall be conducted only as specifically directed by the Court.
03:25:34

No person may make repeated requests to interview or question a juror after the juror has expressed a desire not to be interviewed.
03:25:51

I further instruct you that you should not contact nor attempt to contact any party or attorney participating in this matter to discuss this case and particularly the jury deliberations.

I told you what seemed like an eternity ago, four days
03:26:03

ago, Monday, that your role is a very important role. Your role is so important that it was provided for by the framers of the United States Constitution.

It has been an honor to have presided over this case. This was a week-long trial. I watched you very closely. You were very attentive throughout the entire trial. At no time did my courtroom deputy have to go to nudge you or bring you any water, which, again, showed how wonderful you were as jurors and how you took your role as a juror very seriously.

So I want to thank you personally. It has been my pleasure to preside over this case with you. We're going to go visit in the back for a few minutes. I know y'all want to go home, but we do like to talk with you about your jury experience. We're not going to talk about any of your deliberations, because that's your province and your province only, but we're just going to talk about your experience in general and ways in which we could improve services to you.

I want to thank you on behalf of the plaintiff. I want to thank you on behalf of plaintiff's counsel. And I want to thank you on behalf of the defendant and defense counsel as well.

As I told them out of your presence, it is a great pleasure for me to preside over a case in which the attorneys are very professional and in which the attorneys are very prepared, and so I thanked them already.

And, again, I'm -- since they can't speak with you

03:27:37 directly, I'm thanking you on their behalf as well.

So with that said, we're going to recess right now. And I'm just going to spend like five minutes with you in the back. I know you're anxious to go home to your families, but we are just going to spend a few minutes to talk about your experience.

Thank you very much.

The marshal will escort you back to my chambers.

(Jury out at 3:27 p.m.)

03:27:44 THE COURT: Okay. Does the plaintiff have any motions at this time?

MR. TIMOTHY FALCON: Not at this time, Your Honor.

THE COURT: Defense counsel, any motions at this time?

MR. MCSHANE: No motions, Judge.

03:28:22 THE COURT: Thank you-all very much. And you-all did a great job for your respective clients.

Have a great weekend. We'll see you next time.

(Proceedings adjourned.)

* * * *

**CERTIFICATE**

**I hereby certify this 16th day of January, 2018, that the foregoing is, to the best of my ability and understanding, a true and correct transcript of the proceedings in the above-entitled matter.**

*/s/ Mary V. Thompson*

Official Court Reporter